**No. 25-11293**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

HUMANA, INCORPORATED;
HUMANA BENEFIT PLAN OF TEXAS, INCORPORATED,

Plaintiffs-Appellees,

v.

ROBERT F. KENNEDY, JR., Secretary,
U.S. Department of Health and Human Services, in his official capacity;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of Texas

---

## BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

## STATEMENT REGARDING ORAL ARGUMENT

The government believes that oral argument is warranted to address any questions the panel may have regarding the complex regulatory scheme at issue and the rationales supporting the challenged rule.

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION.................................................................. 3

STATEMENT OF THE ISSUE ......................................................................... 3

STATEMENT OF THE CASE........................................................................... 3

      A.     Statutory and Regulatory Background ...................................................3

          1.     The Medicare Part C risk adjustment model .............................3

          2.     Coding incentives and the coding-pattern adjustment...............7

          3.     Unsupported diagnoses, RADV audits, and the FFS
                Adjuster .......................................................................................9

      B.     The Challenged RADV Rule...............................................................12

      C.     Prior Proceedings ...............................................................................18

SUMMARY OF ARGUMENT ....................................................................... 20

STANDARD OF REVIEW ............................................................................. 22

ARGUMENT .................................................................................................. 22

      THE RADV RULE COMPLIED WITH THE MEDICARE
      STATUTE'S NOTICE-AND-COMMENT REQUIREMENTS ................. 22

      A.     The Medicare Statute Requires Only that the Final Rule Be a
            Logical Outgrowth of the Proposed Rule............................................22

      B.     The Proposed Rule Gave Sufficient Notice for the Final Rule...........28

      C.     The District Court's Contrary Reasoning Is Flawed...........................32

CONCLUSION............................................................................................... 38

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Airlines for Am. v. U.S. Dep't of Transp.*,
　127 F.4th 563 (5th Cir.), *vacated per curiam*,
　154 F.4th 323 (5th Cir. 2025), *on reh'g en banc per curiam*,
　166 F.4th 487 (5th Cir. 2026)................................................................26

*Airlines for Am. v. U.S. Dep't of Transp.*,
　166 F.4th 487 (5th Cir. 2026)................................................................25

*American Radio Relay League, Inc. v. FCC*,
　524 F.3d 227 (D.C. Cir. 2008) ...............................................................24

*Azar v. Allina Health Servs.*,
　587 U.S. 566 (2019) ...............................................................................22

*Board of Miss. Levee Comm'rs v. U.S. EPA*,
　674 F.3d 409 (5th Cir. 2012).................................................................22

*Brennan v. Dickson*,
　45 F.4th 48 (D.C. Cir. 2022) ................................................. 26, 27, 33

*Chaves Cnty. Home Health Serv., Inc. v. Sullivan*,
　931 F.2d 914 (D.C. Cir. 1991) ...............................................................10

*Chemical Mfrs. Ass'n v. U.S. EPA*,
　870 F.2d 177 (5th Cir. 1989).................................................................24

*Dominion Ambulance, LLC v. Azar*,
　968 F.3d 429 (5th Cir. 2020).................................................................10

*Huawei Techs. USA, Inc. v. FCC*,
　2 F.4th 421 (5th Cir. 2021)............................................ 23, 24, 29, 31

*Long Island Care at Home, Ltd. v. Coke*,
　551 U.S. 158 (2007) ........................................................................ 27, 29

*National Lifeline Ass'n v. FCC*,
　921 F.3d 1102 (D.C. Cir. 2019) ....................................... 23, 24, 29

*Ratanasen v. California Dep't of Health Servs.*,
 11 F.3d 1467 (9th Cir. 1993) ...............................................................10

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
 989 F.3d 368 (5th Cir. 2021) ................................................... 24, 25, 34

*United States v. Lahey Clinic Hosp., Inc.*,
 399 F.3d 1 (1st Cir. 2005) ....................................................................10

*United States ex rel. Silingo v. WellPoint, Inc.*,
 904 F.3d 667 (9th Cir. 2018) ..................................................................7

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
 848 F.3d 1161 (9th Cir. 2016) ................................................... 4-5, 6, 7

*UnitedHealthcare Ins. Co. v. Becerra*,
 16 F.4th 867 (D.C. Cir. 2021), *cert. denied*,
 142 S. Ct. 2851 (2022) ................................ 4, 5, 6, 7, 16, 17, 18, 31, 35

**Statutes:**

Deficit Reduction Act of 2005,
 Pub. L. No. 109-171, § 5301(b)(2), 120 Stat. 4, 51 (2006)....................8

5 U.S.C. § 701 *et seq.*.............................................................................18

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1331 .....................................................................................3

42 U.S.C. § 1395 *et seq.*...........................................................................3

42 U.S.C. § 1395d(a) ...............................................................................3

42 U.S.C. § 1395j.....................................................................................3

42 U.S.C. § 1395k(a) ...............................................................................3

42 U.S.C. § 1395w-21(a) ..........................................................................4

42 U.S.C. § 1395w-22(a)(1) ......................................................................4

42 U.S.C. § 1395w-23...................................................................................33

42 U.S.C. § 1395w-23(a)(1)(A) .......................................................................4

42 U.S.C. § 1395w-23(a)(1)(C) ................................................................. 4, 14

42 U.S.C. § 1395w-23(a)(1)(C)(i) ..................................................................31

42 U.S.C. § 1395w-23(a)(1)(C)(ii)(III) .............................................................8

42 U.S.C. § 1395hh(a)(4)........................................................... 23, 26, 28, 29

42 U.S.C. § 1395hh(b)(1) ..............................................................................22

**Regulations:**

42 C.F.R. § 422.310(b) ....................................................................................6

42 C.F.R. § 422.310(d) ....................................................................................6

42 C.F.R. § 422.310(e)..................................................................................6, 7

42 C.F.R. § 422.326 .......................................................................................16

**Other Authorities:**

CMS,
*Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation
Rates and Medicare Advantage and Part D Payment Policies and Final Call
Letter* (Apr. 1, 2019), https://perma.cc/GEJ9-5VT4 .........................................6

39 Fed. Reg. 35,382 (Oct. 1, 1974)..................................................................27

40 Fed. Reg. 7404 (Feb. 20, 1975) ..................................................................27

83 Fed. Reg. 54,982 (Nov. 1, 2018)............................ 12, 13, 28, 30, 32, 35-36, 36

84 Fed. Reg. 30,983 (June 28, 2019) ......................................................... 14, 33

88 Fed. Reg. 6643 (Feb. 1, 2023) ............................... 3, 5, 6, 9, 10, 11, 12, 13, 14,
                                                          15, 16, 18, 28, 31, 35, 36

1 Kristin E. Hickman & Richard J. Pierce, Jr.,
*Administrative Law Treatise* (7th ed. 2024).................................................. 23, 37

*Provision*, Black's Law Dictionary (12th ed. 2024)....................................................26

32 *Wright & Miller's Federal Practice & Procedure* (2d ed.),
Westlaw (database updated Sep. 2025)........................................................ 23, 25

**INTRODUCTION**

Medicare Advantage is an alternative to traditional Medicare in which the Centers for Medicare & Medicaid Services (CMS) pays predetermined amounts to private insurers, known as Medicare Advantage organizations (MAOs), to insure Medicare beneficiaries. These payments are based in part on medical diagnoses that MAOs report for their beneficiaries; MAOs receive larger payments when they report that their beneficiaries are sicker. CMS requires that submitted diagnoses be supported by the beneficiary's medical records, but MAOs sometimes submit diagnoses that lack such support. MAOs also use various methods to find additional diagnoses that increase the likelihood the MAO will submit unsupported diagnoses for payment. CMS is estimated to overpay MAOs by over $10 billion a year because MAOs report diagnoses that lack medical-record support.

This case concerns a CMS rule (the Final Rule) that announced how CMS would expand its audit program to recover more of these overpayments. Plaintiffs challenge CMS's decision not to incorporate a Fee-for-Service Adjuster (FFS Adjuster) in the rule. The adjuster would have allowed MAOs to keep some portion of the payments they receive for diagnoses that lack medical-record support. Plaintiffs argue that an FFS Adjuster is necessary to compensate MAOs because the payments CMS makes for submitted diagnoses are too low.

The district court vacated the Final Rule not for this reason or because of any flaw in the rule itself, but rather on a procedural ground:  that the Final Rule was not a "logical outgrowth" of the notice of proposed rulemaking (Proposed Rule).  That conclusion is wrong.  As relevant here, the Proposed Rule and the Final Rule are substantively identical:  CMS proposed not to implement an FFS Adjuster, and the Final Rule adopted that precise approach.  The Final Rule was therefore plainly a logical outgrowth of the Proposed Rule.

The district court instead relied on perceived differences in the *reasons* CMS offered in the preambles of the Proposed and Final Rules.  However, neither the Medicare statute nor the Administrative Procedure Act (APA) supports applying the "logical outgrowth" requirement in this manner.  The Medicare statute's text applies that requirement only to a "provision" of a regulation, not to the agency's reasoning.  In any event, CMS gave more than sufficient notice of its reasoning because the Proposed Rule and the Final Rule rested on the same rationale:  that it is inappropriate to reduce recoveries in audits—which enforce CMS's medical-record documentation requirement—to address concerns about payment rates.

The district court's unprecedented demand for congruence in an agency's explanations in the preambles to the proposed and final rules would prevent agencies from improving regulations in response to public comments as Congress intended.  The law does not support or permit the court's approach.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331.  ROA.19.  The district court granted summary judgment for plaintiffs, denied summary judgment for defendants, and entered final judgment on September 25, 2025.  ROA.26926-28.  Defendants timely filed a notice of appeal on November 21, 2025.  ROA.26929.  This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in vacating and remanding the Final Rule, 88 Fed. Reg. 6643 (Feb. 1, 2023) (ROA.17069-91), on the ground that the Final Rule was not a "logical outgrowth" of the Proposed Rule.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    The Medicare Part C risk adjustment model

Medicare is a federal health insurance program for the elderly and disabled that is administered by CMS.  *See* 42 U.S.C. § 1395 *et seq.*  Part A of the Medicare statute covers inpatient hospital care and certain other kinds of institutional care.  *See id.* § 1395d(a).  Part B is an optional supplemental insurance program that covers many outpatient medical and other health services.  *See id.* §§ 1395j, 1395k(a).  Under Parts A and B, known as "'traditional'" or "fee-for-service" (FFS) Medicare, "CMS itself acts as the insurer, paying healthcare providers

3

directly for beneficiaries' medical services." *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 2851 (2022).

Part C, also known as Medicare Advantage (MA), gives beneficiaries the option to receive their Medicare benefits through a private insurance plan rather than directly from CMS. *See* 42 U.S.C. § 1395w-21(a). Such plans generally must provide at least the same benefits available under traditional Medicare. *See id.* § 1395w-22(a)(1). CMS pays MAOs "in advance a monthly lump sum . . . for every beneficiary that they enroll, without regard to the services that the beneficiaries will actually receive." *UnitedHealthcare*, 16 F.4th at 872; *see* 42 U.S.C. § 1395w-23(a)(1)(A). The plans in turn pay healthcare providers for care provided to their enrollees. *UnitedHealthcare*, 16 F.4th at 872.

CMS's monthly payments to an MAO for a particular beneficiary are intended to reflect the amount CMS would otherwise spend in traditional Medicare for a beneficiary with the same health status and demographic factors. Specifically, the statute directs the Secretary to "adjust the payment amount . . . for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, . . . so as to ensure actuarial equivalence." 42 U.S.C. § 1395w-23(a)(1)(C). CMS accordingly adjusts payments up or down from a base amount "to reflect the health status" of each beneficiary, among other factors. *United States ex rel. Swoben v. United*

*Healthcare Ins. Co.*, 848 F.3d 1161, 1167 (9th Cir. 2016). These adjustments are intended to ensure that Medicare Advantage plans "are paid appropriately for their plan enrollees (that is, less for healthier enrollees who are expected to incur lower health care costs, and more for less healthy enrollees who are expected to incur higher health care costs)." 88 Fed. Reg. at 6644 (ROA.17070). Absent such risk adjustment, MAOs would have strong "incentives to enroll only the healthiest, and thus least expensive, beneficiaries while steering clear of the sickest and costliest." *UnitedHealthcare*, 16 F.4th at 873-74.

To determine the amount of these risk adjustments and ensure "actuarial equivalence," CMS uses its Hierarchical Condition Category (CMS-HCC) risk adjustment model, which is calibrated based on traditional Medicare data. 88 Fed. Reg. at 6644 (ROA.17070). The model uses regression analysis to produce coefficients, known as "risk factors" or "relative factors," that provide a measure of Medicare's expected marginal costs for each medical condition and demographic factor. *See* 88 Fed. Reg. at 6644-45 (ROA.17070-71); ROA.18883. For any specific beneficiary, adding up the risk factors for that individual's conditions and demographic factors creates a "risk score" that expresses the beneficiary's expected costs relative to the average Medicare beneficiary, who by definition has a risk score of 1.0. 88 Fed. Reg. at 6645 (ROA.17071); ROA.18884.

5

CMS uses these risk scores to adjust MAOs' payments for each beneficiary. 88 Fed. Reg. at 6645 (ROA.17071).  For example, in 2023, an 80-year-old male who is neither institutionalized nor Medicaid-eligible (risk factor 0.556) and has diabetes without complication (0.105) and rheumatoid arthritis (0.421) would have had a risk score of 1.082.  CMS, *Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* 74-76 (Apr. 1, 2019), https://perma.cc/GEJ9-5VT4.  CMS would therefore have paid the MAO 108.2% of the base payment amount to cover that beneficiary—that is, 8.2% more than for the average beneficiary.

Because CMS calculates risk scores based on beneficiary data and diagnosis codes submitted by MAOs, 42 C.F.R. § 422.310(b), (d), (e); 88 Fed. Reg. at 6645 (ROA.17071), proper payment depends on the accuracy of the reported diagnoses. For example, if an MAO wrongly reports that a non-diabetic beneficiary has diabetes (risk factor 0.105), that diagnosis code will erroneously increase the beneficiary's risk score and thus the insurer's payment by 10.5% of the base amount.  It is therefore crucial that "an MAO may only report a diagnosis when that diagnosis is properly supported by the beneficiary's medical records."  88 Fed. Reg. at 6646 (ROA.17072); *see also UnitedHealthcare*, 16 F.4th at 877; *Swoben*, 848 F.3d at 1168.  To enforce this requirement, Medicare regulations establish that

CMS may audit diagnosis codes against the medical record and that insurers will be required to return payments due to unsupported diagnoses. *See, e.g.*, 42 C.F.R. § 422.310(e).

### 2.   Coding incentives and the coding-pattern adjustment

Because MAOs are paid based on the diagnoses they report, MAOs have an incentive to report more diagnoses to increase their payments. *See* ROA.26251-53; *UnitedHealthcare*, 16 F.4th at 876. Thus, for example, many MAOs conduct "chart reviews," which may entail using artificial intelligence or third-party vendors to scan patients' medical records to identify additional diagnoses to report for payment. ROA.19915. The Department of Health and Human Services' Office of Inspector General (OIG) found that in 2017, MAOs obtained $2.7 billion in payments for diagnoses that were reported solely because of chart reviews and were not linked to any treatment provided to that beneficiary, ROA.19929—for example, beneficiaries reported as having vascular disease but lacking any records indicating treatment for such disease, ROA.19925. *See also Swoben*, 848 F.3d at 1168 (False Claims Act litigation involving "one-way" chart reviews that only added but never deleted diagnoses); *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (same). Such payments "may be a payment integrity concern if diagnoses are inaccurate or unsupported—making the associated risk-adjusted payments inappropriate." ROA.19929. The Medicare

7

Payment Advisory Commission (MedPAC), an independent legislative-branch agency that advises Congress on Medicare issues, ROA.26144, found that "[i]n 2020, differences in diagnostic coding caused Medicare to pay MA plans $12 billion more than it would have spent if the same beneficiaries had been enrolled in FFS Medicare," ROA.26246.

Congress has long recognized that coding practices in Medicare Advantage reduce payment accuracy, or "actuarial equivalence," by making payments to MAOs too high. Noting the existence of "differences in [diagnosis] coding patterns between Medicare Advantage plans" and traditional Medicare providers, Congress directed the Secretary to study and "ensure that [risk] adjustment . . . reflects" those differences. *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5301(b)(2), 120 Stat. 4, 51 (2006). After conducting that study, CMS implemented a coding-pattern adjustment that reduced all Medicare Advantage risk scores by 3.41% for 2010, which CMS indicated was "conservative." ROA.18408. Congress subsequently codified and extended the coding-pattern adjustment by mandating that CMS reduce Medicare Advantage risk scores even further, setting a minimum reduction of 5.9% from 2019 onwards. 42 U.S.C. § 1395w-23(a)(1)(C)(ii)(III).

### 3. Unsupported diagnoses, RADV audits, and the FFS Adjuster

Payments to MAOs based on unsupported diagnoses—diagnosis codes that lack medical-record documentation—are a particular overpayment concern. CMS has estimated that MAOs obtain over $10 billion in such overpayments each year, and that 7% of all payments to MAOs are overpayments. ROA.21952. Both OIG and the Government Accountability Office have identified Medicare Advantage as a high-risk program due to the volume of overpayments to MAOs. 88 Fed. Reg. at 6645 (ROA.17071).

CMS's principal mechanism for enforcing the medical-record-documentation requirement is the Risk Adjustment Data Validation (RADV) program. 88 Fed. Reg. at 6645 (ROA.17071). RADV audits test, for a sample of a plan's enrollees, whether reported diagnoses are actually documented in the medical record. *Id.* Plaintiffs challenge CMS's explanations for the methodologies to be used in these audits, so some understanding of those methodologies is necessary to understand plaintiffs' claims.

For many years, recoveries for unsupported diagnoses CMS discovered during RADV audits "were limited to enrollee-level adjustments" for the specific "enrollees sampled in the audits." 88 Fed. Reg. at 6645-46 (ROA.17071-72). Thus, "for the few MA plans . . . audited, payment recovery amounts were small." *Id.*

9

After pausing RADV audits for several years to refine its audit methodology, CMS released an informal proposal in 2010 to use "statistical methods to calculate extrapolated improper payments" for an entire contract. 88 Fed. Reg. at 6646 (ROA.17072); *see* ROA.7929. Thus, rather than simply recovering overpayments for specific unsupported diagnoses discovered in the audit sample, CMS would extrapolate an error rate from that sample to the entire contract. 88 Fed. Reg. at 6646 (ROA.17072). By using sampling and extrapolation—which "have been used to calculate improper payments in" traditional Medicare "for decades," 88 Fed. Reg. at 6648 (ROA.17074)—CMS could effectively conduct a broader audit of the contract. *See Dominion Ambulance, LLC v. Azar*, 968 F.3d 429, 440 (5th Cir. 2020) (upholding use of sampling and extrapolation and noting that "courts have concluded that 'statistical sampling is the only feasible method available' for HHS to effectively audit waste and fraud in the Medicare and Medicaid programs"); *see also Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 922 (D.C. Cir. 1991); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005); *Ratanasen v. California Dep't of Health Servs.*, 11 F.3d 1467, 1469-71 (9th Cir. 1993).

Some MAOs objected to this methodology on the ground that a broader audit would cause them to be underpaid. Their theory is exceedingly complex, but at a high level, they contended that CMS's payment rates for diagnoses—the risk

factors discussed above—are too low.  88 Fed. Reg. at 6646 (ROA.17072).  That is

so, these MAOs contended, because CMS's risk adjustment model calculates

payment rates based on diagnosis data from traditional Medicare, which the MAOs

characterized as "unaudited."  *Id.*  As a result, they argued, medical conditions are

overdiagnosed in traditional Medicare, which causes the risk adjustment model to

underestimate the cost of treating particular conditions relative to their true cost.

*Id.*  And because the payment rates or risk factors for these conditions are too low,

payments to MAOs will violate the Medicare statute's actuarial-equivalence

requirement if MAOs are limited to collecting payment for diagnoses that actually

have medical-record support.  *Id.*

To counteract this underpayment, these MAOs argued, CMS should allow

them to keep some payments that CMS would otherwise recover through RADV

audits for lack of medical-record documentation.  88 Fed. Reg. at 6646

(ROA.17072).  Allowing MAOs to keep payments for unsupported diagnoses—or

in other words, lowering the "documentation standard"—would, in their view,

compensate MAOs for underlying payment rates that were too low.  *Id.*

To accommodate these MAOs' concerns, CMS released a new version of the

audit methodology in 2012 that stated that CMS intended to adopt an "FFS

Adjuster."  ROA.8223.  The adjuster would serve "as an offset to the preliminary

recovery amount" identified in an RADV audit, ROA.8223, allowing MAOs to

retain some portion of the payments they collected for unsupported diagnoses. The methodology did not specify the amount of the FFS Adjuster but instead stated that "[t]he actual amount of the adjuster will be calculated by CMS based on a" future study. ROA.8224. That study (the FFS Adjuster Study) ultimately concluded that an FFS Adjuster was unwarranted because "errors in FFS claims data do not have any systematic effect on the risk scores calculated by the CMS-HCC risk adjustment model, and therefore do not have any systematic effect on the payments made to MA organizations." ROA.7911-12. CMS has never applied the FFS Adjuster in an issued RADV audit. 88 Fed. Reg. at 6647 (ROA.17073).

### B. The Challenged RADV Rule

In 2018, CMS issued a notice of proposed rulemaking (Proposed Rule) in which it proposed to codify a methodological approach for all non-finalized RADV audits. 88 Fed. Reg. at 6647 (ROA.17073). As in 2010 and 2012, CMS proposed to "recover overpayments based on extrapolated audit findings through the use of statistically valid random sampling techniques." 83 Fed. Reg. 54,982, 55,038 (Nov. 1, 2018) (ROA.10455).

CMS also proposed not to apply an FFS Adjuster. 83 Fed. Reg. at 55,040 (ROA.10457). CMS cited the results of the FFS Adjuster Study but also determined that, "even if we had found that diagnosis error in FFS claims data led to systematic payment error in the MA program, we no longer believe that a

12

RADV-specific payment adjustment would be appropriate." *Id.* at 55,041 (ROA.10458). CMS explained that it was "inappropriate" to use "an adjustment to RADV recoveries"—that is, allowing MAOs to keep some payments for unsupported diagnoses—"to remedy payment accuracy concerns" with CMS's risk adjustment model. *Id.* As the agency noted, "RADV audits do not address issues with the accuracy of payments based on" valid diagnoses, but are rather "used to recover payments based on diagnoses that are not supported by medical record documentation, which thus should not have been reported to CMS." *Id.* "If a payment has been made to an MA organization based on a diagnosis code that is not supported by medical record documentation," the agency explained, "that entire payment is in error and should be recovered in full, because the payment standard has not been met, and the MA organization is not entitled to any payment for that diagnosis." *Id.* The agency further reasoned that addressing payment accuracy by altering audit recoveries "would introduce inequities between audited and unaudited plans, by only correcting the payments made to audited plans." *Id.*

For several years, CMS did not issue a final rule but instead engaged in further dialogue with the public. 88 Fed. Reg. at 6647-48 (ROA.17073-74). CMS released various data and materials underlying the FFS Adjuster Study, as well as a replication of the study that provided additional data not preserved from the original study. *Id.* CMS also extended the comment period several times and

13

specifically sought additional comment regarding whether 42 U.S.C. § 1395w-23(a)(1)(C)—which contains the actuarial-equivalence requirement and the coding-pattern adjustment—"mandates an FFS Adjuster, prohibits an FFS Adjuster, or should otherwise be read to inform our proposal not to apply an FFS Adjuster in any RADV extrapolated audit methodology."  84 Fed. Reg. 30,983, 30,983 (June 28, 2019) (ROA.10468).

CMS promulgated the final RADV Rule (Final Rule) in 2023.  *See* 88 Fed. Reg. 6643 (ROA.17069-91).  The Final Rule provided that CMS would use extrapolation in RADV audits, but only for audits from payment year 2018 onward.  *Id.* at 6643-44 (ROA.17069-70).  The rule also provided that CMS would not apply an FFS Adjuster in RADV audits for two reasons.  *Id.*

First, the Final Rule explained that "[i]t would be inappropriate" to use RADV audits to address claims of systemic payment error in "the analyses performed to determine the risk adjustment coefficients used to calculate risk scores, and thus risk-adjusted payments."  88 Fed. at 6658 (ROA.17084).  CMS likewise agreed with commenters like MedPAC who stated that, even if systemic error in payment rates existed, "applying an FFS Adjuster to RADV would not be the appropriate remedy to address that bias."  *Id.* at 6656 (ROA.17082); *see also* ROA.3151-52 (MedPAC comments regarding FFS Adjuster).

14

CMS reasoned that the Medicare statute's payment-accuracy provision—the actuarial-equivalence requirement—does not apply "to the obligation of MAOs to return improper payments" discovered in RADV audits, but instead "applies only to how CMS risk adjusts the payments it makes to MAOs." 88 Fed. Reg. at 6644 (ROA.17070). CMS explained that RADV audits instead "enforce[] the longstanding medical record documentation regulatory requirement," *id.* at 6658 (ROA.17084), by "recover[ing] payments that were made improperly based on diagnoses not supported by medical record documentation," *id.* at 6656 (ROA.17082). Thus, "[i]f a payment is made to an MAO based on a diagnosis code not supported by medical record documentation, the entire payment for that code is in error and should be recovered in full because the payment standard has not been met." *Id.* at 6656-57 (ROA.17082-83). CMS further noted that, "even if systematic error exists, it would be inequitable to correct such errors in the payments made only to audited plans through the application of an FFS Adjuster." *Id.* at 6657 (ROA.17083).

Second, the Final Rule explained that the theory that payment rates were too low was inconsistent with Congress's requirement that CMS reduce payment rates by ever-larger amounts through the coding-pattern adjustment. CMS reasoned that "it would not be reasonable to read the" statute "as requiring a reduction in payments to MAOs by a statutorily-set minimum adjustment in the coding pattern

adjustment, while at the same time prohibiting CMS from enforcing longstanding documentation requirements by requiring an offset to the recovery amounts calculated for CMS audits." 88 Fed. Reg. at 6644 (ROA.17070).

The Final Rule did not rely on the empirical findings from the FFS Adjuster Study. 88 Fed. Reg. at 6659 (ROA.17085). CMS recognized that commenters had engaged in "lengthy analysis and critique" of the study and that some commenters had offered counter-studies. *Id.* CMS explained, however, that "[e]ven if systematic payment error exists, it does not impact the requirement that submitted diagnoses must be adequately supported by medical records" and that it was inappropriate to correct any systemic payment errors through the RADV program. *Id.* CMS also offered substantive reasons why it disagreed with "commenters who claim that our study or their counter-studies provide evidence that FFS errors systematically reduce payments to MAOs." *Id.*

Finally, CMS explained that its reasoning was consistent with the D.C. Circuit's decision in *UnitedHealthcare*, 16 F.4th 867. 88 Fed. Reg. at 6656 (ROA.17082). *UnitedHealthcare* did not address RADV audits but instead upheld CMS's decision not to incorporate a similar FFS Adjuster in another Medicare Advantage rule known as the Overpayment Rule, 42 C.F.R. § 422.326. *UnitedHealthcare*, 16 F.4th at 869. That rule "requires that, if an insurer learns a diagnosis it submitted to CMS for payment lacks support in the beneficiary's

16

medical record, the insurer must refund that payment within sixty days." *Id.* An

MAO challenged the rule on a similar ground to the one raised here—that

requiring MAOs to return payments for unsupported diagnoses without applying

an FFS Adjuster would violate actuarial equivalence. *Id.* at 882.

The D.C. Circuit rejected that argument, concluding that "the actuarial-

equivalence requirement is not an 'entitle[ment] . . . to a precise payment amount'

for a Medicare Advantage insurer, but only 'an instruction to the Secretary

regarding the design of the risk adjustment model as a whole . . . describ[ing] the

type of "payment amount[s]" that the risk adjustment model should produce.'"

*UnitedHealthcare*, 16 F.4th at 885 (alterations in original). Interpreting the

Medicare statute, the court held that this "requirement does not apply to the

separate statutory obligation on insurers to refund overpayments they erroneously

elicit from CMS" or to the Overpayment Rule. *Id.* at 884. The court further noted

that, even if the requirement did apply, "there is no evidence of any . . . systemic

skew in traditional Medicare data, and, indeed, UnitedHealth never challenged the

values CMS assigned to the relative factors." *Id.* at 885. The court concluded that

"UnitedHealth cannot now use actuarial equivalence to litigate belated objections

to the risk-adjustment model or the level of its monthly payments through the back

door of the Overpayment Rule." *Id.* at 887. The court also found "implausible"

UnitedHealth's "underlying premise . . . that traditional Medicare data includes a

17

significant rate of unsupported diagnosis codes that ultimately depresses the payments to Medicare Advantage insurers." *Id.* at 888.

In the final RADV Rule, CMS explained that its decision not to apply an FFS Adjuster was consistent with *UnitedHealthcare* because, although *UnitedHealthcare* did not address RADV, "[t]he RADV program, like the Overpayment Rule, applies after" risk-adjusted payments are made "to require MAOs to refund any payment to which they are not entitled, based on diagnoses that lack support in the medical record." 88 Fed. Reg. at 6656 (ROA.17082).

### C.    Prior Proceedings

Plaintiffs Humana Inc. and Humana Benefit Plan of Texas, Inc. filed suit under the APA, 5 U.S.C. § 701 *et seq.*, to challenge the Final Rule.  Plaintiffs raised three claims:  (1) that CMS's decision not to include an FFS Adjuster in the Final Rule was arbitrary, capricious, contrary to law, or in excess of statutory authority, ROA.52; (2) that CMS's decision to apply the rule to audits for payment year 2018 and later was in excess of statutory authority and an abuse of discretion, ROA.54; and (3) that CMS's decision not to include an FFS Adjuster failed to comply with notice-and-comment rulemaking requirements because the decision relied in part on *UnitedHealthcare*, 16 F.4th 867, which was decided after publication of the Proposed Rule, ROA.55.

The district court denied the government's motion to transfer venue and to dismiss for lack of standing and ripeness, ROA.394.

The district court subsequently entered summary judgment for plaintiffs and vacated and remanded the RADV Rule.  ROA.26927.  The court ruled solely on plaintiffs' third claim, "that the Final Rule is procedurally invalid as it was not a 'logical outgrowth' of the Proposed Rule," ROA.26918, reasoning that CMS "chang[ed] the justifications for the rule" from the Proposed Rule to the Final Rule, ROA.26919.  The court reasoned that the Final Rule's rationale "that an FFS Adjuster is neither required nor appropriate in the context of RADV audits because the actuarial-equivalence requirement does not apply as a matter of law" did not "logically flow[] from one of the Proposed Rule's justifications."  ROA.26920.[1] The court concluded that "Plaintiffs should not have reasonably anticipated that CMS's discussion regarding whether FFS Adjusters correct payment errors or simply create inequities would result in a finding that actuarial equivalence does not apply."  ROA.26922.

The district court also rejected the government's reliance on CMS's additional request for comment regarding whether the provision containing the actuarial-equivalence requirement should inform its proposal not to adopt an FFS

---

[1] The court did not address the Final Rule's reasoning regarding the coding-pattern adjustment because the government did not contend that it was present in the Proposed Rule.  ROA.26920.

Adjuster. The court reasoned that "[t]here is no specific indication here that would alert the reader to the fact that CMS was considering abandoning [its] justifications for a finding that actuarial equivalence does not apply." ROA.26923. Finally, the court rejected the government's arguments that CMS was not required to seek comment on a question of statutory interpretation, and that any error was harmless. ROA.26925-26.

## SUMMARY OF ARGUMENT

The Medicare statute's notice-and-comment rulemaking provision, which is distinct from similar requirements in the APA, provides that a "provision" of a final rule can take effect only if it is a "logical outgrowth" of a proposed rule. Here, the Final Rule complied with that requirement because it followed exactly the same approach—declining to include an FFS Adjuster—as the Proposed Rule. The Final Rule was therefore plainly a logical outgrowth of the Proposed Rule.

The district court nonetheless concluded that the Proposed Rule provided inadequate notice because of perceived differences in the *reasons* stated in the preambles to the Proposed Rule and the Final Rule. But the Medicare statute's "logical outgrowth" requirement applies to a "provision" of a final rule, not the reasons given for that provision. Neither the district court nor the parties have cited any case finding that such differences in reasoning alone violate the APA or the Medicare statute, and the Supreme Court upheld a rule against a "logical

20

outgrowth" challenge when the reasoning in the final rule did not appear in the proposed rule at all.  In any event, the Proposed Rule and the Final Rule both relied on the same rationale:  RADV audits are intended to recover payments to which MAOs were never entitled because of a lack of medical-record documentation, not to ensure actuarial equivalence, so it is inappropriate to limit RADV audit recoveries based on payment-accuracy concerns even if the risk adjustment model produces payments that are too low.

The district court's contrary reasoning is fundamentally flawed.  The court's belief that the agency changed its reasoning rests in large part on a failure to appreciate that the Proposed Rule's discussions of "systemic payment error" and "payment accuracy" referred to the same concept as the Final Rule's discussion of "actuarial equivalence."  Accurate payments are those that are actuarially equivalent; systemic payment error occurs when payments are biased downwards or upwards and therefore not actuarially equivalent.  Moreover, CMS specifically requested additional comment on how the statutory clause that contains the actuarial-equivalence requirement should inform its proposal not to incorporate an FFS Adjuster.  Interested parties should therefore have foreseen that the agency might take the position that the actuarial-equivalence requirement does not require CMS to limit RADV audit recoveries to remedy payment-accuracy concerns.  Nothing more was required.

21

**STANDARD OF REVIEW**

The Court "review[s] a grant of summary judgment de novo, applying the same standard as the district court." *Board of Miss. Levee Comm'rs v. U.S. EPA*, 674 F.3d 409, 417 (5th Cir. 2012).

**ARGUMENT**

**THE RADV RULE COMPLIED WITH THE MEDICARE STATUTE'S NOTICE-AND-COMMENT REQUIREMENTS**

CMS fully complied with all applicable notice-and-comment-rulemaking requirements in promulgating the RADV Rule. The Proposed Rule informed the public that CMS intended not to incorporate an FFS Adjuster in its audit methodology, and the Final Rule in fact adopted that approach. The Proposed Rule therefore more than adequately framed the subjects for discussion such that interested parties should have anticipated the agency's final approach.

**A.    The Medicare Statute Requires Only that the Final Rule Be a Logical Outgrowth of the Proposed Rule**

The Medicare statute contains independent notice-and-comment rulemaking provisions distinct from those in the APA. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 569 (2019) (explaining that Medicare statute, rather than APA, defines notice-and-comment-rulemaking requirements in Medicare). In addition to requiring publication of proposed regulations and a 60-day comment period, 42 U.S.C. § 1395hh(b)(1), the statute specifies that "a provision" of a final rule "that

22

is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule . . . shall not take effect" without further opportunity for comment. *Id.* § 1395hh(a)(4). The statute's "logical outgrowth" language refers to case law developed under the APA and discussed below.

Under the APA, courts have held that an agency fails to give sufficient notice in two types of cases: first, when "the divergence between the proposed action and the final action was so great that parties affected by the final action had no way of knowing that the agency was considering one or more critical elements of the final action"; and second, when "the agency relied on data to support its final action that was not known to affected parties until the agency announced its final action." 1 Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 5.3, at 686 (7th ed. 2024); 32 *Wright & Miller's Federal Practice & Procedure* § 8183 (2d ed.), Westlaw (database updated Sep. 2025) (identifying same "two lines of judicial precedent").

In the first category, which is relevant only when "a final rule includes a requirement that differs . . . from the . . . proposed rule," 1 Hickman & Pierce, *supra*, § 5.3.1, at 686, notice is sufficient if the final rule "is a 'logical outgrowth' of the proposed rule," *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (quoting *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)). In other words, "the notice must 'adequately frame the subjects for

23

discussion' such that 'the affected party "should have anticipated" the agency's final course in light of the initial notice.'" *Id.* (quoting *National Lifeline Ass'n*, 921 F.3d at 1115). "If a party 'should have anticipated' that course, it 'reasonably should have filed [its] comments on the subject during the notice-and-comment period.'" *Id.* (alteration in original) (quoting *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021)). The agency's proposed rule is not "required to 'specifically identify "every precise proposal which [the agency] m[ight] ultimately adopt,"'" and the agency can "implement[] changes in the final rule 'instigated by . . . comments' during the rulemaking." *Id.* at 448 (first, second, and fourth alterations in original) (quoting *Chemical Mfrs. Ass'n v. U.S. EPA*, 870 F.2d 177, 203 (5th Cir. 1989)). The Medicare statute's "logical outgrowth" language refers to this line of cases.

The rule in the second category "require[s] agencies to disclose, in time to allow for meaningful comment, technical data or studies on which they relied in formulating proposed rules." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part, concurring in the judgment in part, and dissenting in part). *But see id.* (explaining that this rule "cannot be squared with the text of § 553 of the APA" and "creates a serious jurisprudential problem because the Supreme Court later rejected this kind of freeform interpretation of the APA"). Thus, for example, this Court has vacated a

rule where the agency "conceded that it violated the APA when it failed to provide additional notice and the opportunity to comment on a study that was 'critical to the Rule's issuance.'" *Airlines for Am. v. U.S. Dep't of Transp.*, 166 F.4th 487, 488 (5th Cir. 2026) (en banc) (per curiam); *see also* 32 *Wright & Miller's Federal Practice & Procedure*, *supra*, § 8183 (explaining that this "line of precedent requires agencies to disclose scientific and technical information that they have relied upon in developing a rule in order to allow effective comments"). It is unclear whether the Medicare statute's "logical outgrowth" language encompasses this line of cases, and, in any event, plaintiffs here do not contend that CMS failed to disclose any technical data or studies that it relied on for the Final Rule.

This Court recently stated in *Texas Ass'n of Manufacturers* that "[t]he agency's rationale for the rule must be made clear and subjected to public comment," 989 F.3d at 382, but that statement must be understood in light of the fact that the case fell squarely within the second category discussed above. The Court ultimately held that the agency failed to provide adequate notice because the final rule relied on new data and a new data-analysis methodology that were not previously disclosed. *Id.* at 383-84. This Court has since cited that portion of *Texas Ass'n of Manufacturers* for the proposition that "[i]f an agency promulgates a rule based on 'completely new and different data' that 'supplant[s]' or 'replace[s] its original data,' the agency may need to 'afford interested parties an opportunity

to challenge the underlying factual data relied upon.'" *Airlines for Am. v. U.S. Dep't of Transp.*, 127 F.4th 563, 579 (5th Cir.) (second and third alterations in original), *vacated per curiam*, 154 F.4th 323 (5th Cir. 2025), *on reh'g en banc per curiam*, 166 F.4th 487 (5th Cir. 2026).

Neither the parties nor the district court have cited any decision of any court striking down a rule solely because of differences in how the preambles to the proposed and final rules explained the agency's reasoning, as opposed to a failure to disclose critical technical data or studies. Here, such an approach would be inconsistent with the Medicare statute's text, which applies the "logical outgrowth" requirement only to a "provision" of a regulation: "If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking . . . , such provision . . . shall not take effect" without "further opportunity for public comment." 42 U.S.C. § 1395hh(a)(4). A requirement in the text of a regulation is a "provision" of that regulation, but an agency's explanation for that requirement in the preamble is not. *See Provision*, Black's Law Dictionary (12th ed. 2024) (defining "[p]rovision" as "[a] clause in a statute, contract, or other legal instrument").

More generally, "the very premise of" notice-and-comment rulemaking is "that rules evolve from conception to completion." *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022). Thus, even with respect to the actual substance of a

26

regulation's text, "the APA does not require that rules be subjected to multiple cycles of notice and comment until the version adopted as final is identical to the last notice of proposed rulemaking." *Id.* That principle applies with even greater force to an agency's *explanations* for a regulation's requirements. Thus, in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007), the Supreme Court considered a logical-outgrowth challenge to a final rule that omitted an exception previously included in the proposed rule. The Court upheld the rule, reasoning that the agency's change in position was "reasonably foreseeable": "[s]ince the proposed rule was simply a proposal, its presence meant that the Department was *considering* the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it." *Id.* The Court further found sufficient the agency's *explanation* for its reversal between the proposed rule and the final rule— that the final rule's approach "is 'more consistent' with [the] statutory language"— even though that explanation never appeared in the proposed rule. *Id. Compare* 39 Fed. Reg. 35,382, 35,382 (Oct. 1, 1974) (proposed rule), *with* 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (final rule). The Supreme Court did not suggest that the proposed rule needed to provide notice of the explanation the agency gave in the final rule.

27

**B.    The Proposed Rule Gave Sufficient Notice for the Final Rule**

1.    CMS fully complied with the Medicare statute's notice requirement because the relevant "provision" of the Final Rule was plainly a "logical outgrowth" of the Proposed Rule.  42 U.S.C. § 1395hh(a)(4).  In the Proposed Rule, the agency "propose[d] not to include an FFS Adjuster in any final RADV payment error methodology."  83 Fed. Reg. at 55,041 (ROA.10458); *see also id.* at 54,984, 55,048.  In the Final Rule, the agency adopted that proposal.  88 Fed. Reg. at 6644 (ROA.17070).  There is accordingly no difference in text or substance between the Proposed Rule and the Final Rule with respect to any FFS Adjuster.  Nor did the Final Rule rely on undisclosed technical data or studies.

The district court's ruling rested not on a violation of these notice requirements but rather the court's decision to apply the "logical outgrowth" test to the explanations offered in the rule's preamble.  The court found the rule unlawful because, in the court's view, the Final Rule's reasoning "that an FFS Adjuster is neither required nor appropriate in the context of RADV audits because the actuarial-equivalence requirement does not apply as a matter of law" did not "logically flow[] from one of the Proposed Rule's justifications."  ROA.26920.  As discussed above, however, this Court has never held that an agency violated notice-and-comment rulemaking requirements solely on that ground; nor have other courts recognized such a requirement.  *See supra* pp. 23-27.  Such a rule

28

would be inconsistent with the Medicare statute's limitation of the "logical outgrowth" requirement to "a provision" of "a final regulation," 42 U.S.C. § 1395hh(a)(4), and with precedent like *Long Island Care at Home*, 551 U.S. at 175, which found notice adequate even though the agency's explanation for its change of position in the final rule never appeared in the proposed rule. *See supra* pp. 26-27.

2.    Even if this Court were to apply the "logical outgrowth" test to CMS's reasoning, the RADV Rule would more than pass muster. The preamble to the Proposed Rule "'adequately frame[d] the subjects for discussion' such that 'the affected party "should have anticipated" the agency's final course in light of the initial notice.'" *Huawei Techs.*, 2 F.4th at 447 (quoting *National Lifeline Ass'n*, 921 F.3d at 1115).

The argument some MAOs made for the FFS Adjuster was that errors in the data used to calibrate CMS's risk adjustment model cause the model to underestimate the cost of treating various conditions—that is, the "risk factors" for those diagnoses. Thus, if MAOs were limited to collecting payment for properly-supported diagnoses, their payments would be too low and not actuarially equivalent. These MAOs therefore argued that they should be allowed to retain some of the payments they collect for diagnoses that lack medical-record support. *See supra* pp. 10-11.

29

CMS decided not to include an FFS Adjuster in both the Proposed Rule and the Final Rule because, in CMS's view, this payment-accuracy concern does not bear on recoveries in RADV audits, which are instead intended to enforce the medical-record documentation requirement by recovering payments to MAOs for unsupported diagnoses. CMS accordingly concluded that it was improper to use RADV audits to correct any systematic underpayment of insurers even if the risk adjustment model produced payment rates that were not actuarially equivalent. Thus, the preamble to the Proposed Rule explained:

> RADV audits are used to recover payments based on diagnoses that are not supported by medical record documentation, which thus should not have been reported to CMS. If a payment has been made to an MA organization based on a diagnosis code that is not supported by medical record documentation, that entire payment is in error and should be recovered in full, because the payment standard has not been met, and the MA organization is not entitled to any payment for that diagnosis. RADV audits do not address issues with the accuracy of payments based on diagnosis codes that are supported by medical record documentation. Consequently, an adjustment to RADV recoveries to remedy payment accuracy concerns is inappropriate. For this reason, we believe that it would not be appropriate to correct any systematic payment error in the MA program through a payment adjustment that was only applied to audited contracts.

83 Fed. Reg. at 55,041 (ROA.10458).

The Final Rule relied on the same reasoning:

> The RADV program enforces the longstanding medical record documentation regulatory requirement as it relates to risk adjustment, not the analyses performed to determine the risk adjustment coefficients used to calculate risk scores, and thus risk-adjusted payments. It would be inappropriate to address these determinations

30

and calculations via this final rule's RADV payment error methodology.

88 Fed. Reg. at 6658 (ROA.17084).  In places, the Final Rule also used the statutory term "actuarial equivalence," 42 U.S.C. § 1395w-23(a)(1)(C)(i):

> [W]e believe that the actuarial equivalence provision of the statute applies only to how CMS risk adjusts the payments it makes to MAOs, and not to the obligation to return improper payments for diagnosis codes submitted by MAOs to CMS lacking medical record support.  . . . "The role of the actuarial-equivalence provision is to require CMS to model a demographically and medically analogous beneficiary population in traditional Medicare to determine the prospective lump-sum payments to [MAOs]." . . .  The purpose of RADV audits is to recover payments that were made improperly based on diagnoses not supported by medical record documentation.  If a payment is made to an MAO based on a diagnosis code not supported by medical record documentation, the entire payment for that code is in error and should be recovered in full because the payment standard has not been met.

88 Fed. Reg. at 6656-57 (ROA.17082-83) (third alteration in original) (citations omitted) (quoting *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 870 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 2851 (2022)).

As these passages demonstrate, the Proposed Rule's reasoning "adequately frame[d] the subjects for discussion" such that plaintiffs "should have anticipated the agency's final course in light of the initial notice."  *Huawei Techs.*, 2 F.4th at 447 (quotation marks omitted).  Indeed, the reasons CMS offered are identical: that even if the MAOs were right that payment rates were too low, payment-accuracy concerns do not bear on RADV audits, which are instead intended to

recover payments to which MAOs are not entitled because they were made based on diagnoses unsupported by medical records.

### C.    The District Court's Contrary Reasoning Is Flawed

1.    The district court's contrary reasoning is deeply flawed.  The court's primary rationale appears to be that "[p]laintiffs should not have reasonably anticipated that CMS's discussion" in the Proposed Rule "would result in a finding that actuarial equivalence does not apply" to RADV audits.  ROA.26922.  But the court failed to appreciate that, in this context, "actuarial equivalence," "systemic payment error in the MA program," and "payment accuracy" refer to the same concepts.  Both actuarial equivalence and payment accuracy refer to the statutory objective that the risk adjustment model should produce appropriate payments to MAOs; systemic payment error refers to payments that are biased downwards or upwards such that they fail to achieve actuarial equivalence because they do not approximate what CMS would spend on the same beneficiaries in traditional Medicare.  *See supra* pp. 4-7, 10-12.  Thus, the Proposed Rule's statement that "it would not be appropriate to correct any systematic payment error in the MA program" by adjusting RADV audit recoveries, 83 Fed. Reg. at 55,041 (ROA.10458), gave direct notice of the Final Rule's reasoning that it was not appropriate to limit RADV audit recoveries to address actuarial-equivalence

32

concerns—and, necessarily, that actuarial equivalence does not *require* CMS to do so.

Any doubt as to whether CMS's reasoning in the Proposed Rule encompassed the statutory actuarial-equivalence requirement was resolved in CMS's 2019 request for additional comment. That request sought "comment on whether 42 U.S.C. 1395w-23—and in particular clause (a)(1)(C)," which contains the actuarial-equivalence requirement as well as the coding-pattern adjustment— "mandates an FFS Adjuster, prohibits an FFS Adjuster, or should otherwise be read to inform our proposal not to apply an FFS Adjuster in any RADV extrapolated audit methodology." 84 Fed. Reg. at 30,983 (ROA.10468). CMS thus gave notice that it was specifically considering whether or not the clause containing the actuarial-equivalence requirement bears on RADV audit recoveries. An agency plainly provides sufficient notice "when it has 'expressly asked for comments on a particular issue.'" *Brennan*, 45 F.4th at 69. For the same reason, although the district court did not suggest it was necessary for the agency to do so, the request for additional comment also gave notice that the agency might rely on the coding-pattern adjustment in its final rule.

The district court objected that "[t]here is no specific indication here that would alert the reader to the fact that CMS was considering abandoning the just-mentioned justifications for a finding that actuarial equivalence does not apply"

33

and that CMS's citation to the statute "signals to the reader that CMS believes the" cited provisions "are applicable to RADV audits." ROA.26923. But the agency had already proposed not to include an FFS Adjuster on the ground that payment-accuracy concerns are not a proper ground for limiting RADV audit recoveries. The request for additional comment, in specifically asking the public for comment on whether or not the statutory clause containing the actuarial-equivalence requirement should "inform" that proposal, gave more than enough notice that "interested parties 'should have anticipated' that" CMS might conclude that actuarial equivalence does not limit or bear on RADV audit recoveries. *Texas Ass'n of Mfrs.*, 989 F.3d at 381 (quotation marks omitted). Any interested parties who believed that RADV audit recoveries *are* limited by actuarial equivalence therefore had notice to submit comments accordingly.

2. The district court also reasoned that the Proposed Rule "does not give the reader any indication that CMS is reconsidering an over thirteen-year-old precedent regarding the application of the actuarial-equivalence provision to RADV audits," ROA.26922, but it is not obvious what "precedent" the district court was referring to. The proposed audit methodology CMS released in 2010 (13 years before the Final Rule) did not mention an FFS Adjuster or actuarial equivalence. *See* ROA.7929-31. Perhaps the district court was referring to the audit methodology CMS released in 2012 (13 years before the district court's

34

decision), but that methodology stated only that CMS intended to use an FFS Adjuster—whose amount would be calculated in the future—to address MAOs' concerns about underpayment. *See* ROA.8223-24. The document does not discuss actuarial equivalence, whether actuarial equivalence constrains RADV audits, or whether actuarial equivalence requires an FFS Adjuster. In any event, the 2018 Proposed Rule plainly indicated that CMS intended to take the opposite approach to the 2012 methodology—that is, not to include an FFS Adjuster—on the ground that it was inappropriate to use RADV audits to address payment-accuracy concerns. The Proposed Rule therefore gave clear notice that the agency was proposing to reverse whatever positions the district court interpreted CMS as having taken in 2012.

The district court also criticized in a footnote CMS's reliance on the D.C. Circuit's decision in *UnitedHealthcare*, 16 F.4th 867, ROA.26924 n.31, but the Final Rule reasoned only that CMS's "position is consistent with the D.C. Circuit's decision in" that case, not that the decision was an independent reason to adopt the Final Rule, 88 Fed. Reg. at 6656 (ROA.17082). Nothing in the Medicare statute or the APA prohibits an agency from discussing intervening case law that supports— or undercuts—its position. Moreover, the Proposed Rule expressly cited the district court litigation from which the D.C. Circuit appeal arose and stated that "the government is reviewing that decision and considering its response," 83 Fed.

35

Reg. at 55,040 n.29 (ROA.10457 n.29), and commenters likewise cited the district court decision, 88 Fed. Reg. at 6656 (ROA.17082).

3.    Finally, the district court asserted that the Final Rule "abandons the Proposed Rule's stated rationale that 'correct[ing] any systematic payment error in the MA program through a payment adjustment that was only applied to audited contracts . . . would introduce inequities between audited and unaudited plans, by only correcting the payments made to audited plans.'" ROA.26921 (alterations in original) (quoting 83 Fed. Reg. at 55,041 (ROA.10458)).  The court believed that the inequity rationale "does not appear in the Final Rule, and thus could not have been a contributing factor for the new justification." ROA.26922.

The district court's conclusion is factually wrong and contradicted by the Federal Register.  The Final Rule did not abandon the inequity rationale; to the contrary, it expressly relied on it.  The Final Rule specifically stated that, "even if systematic error exists, it would be inequitable to correct such errors in the payments made only to audited plans through the application of an FFS Adjuster." 88 Fed. Reg. at 6657 (ROA.17083).  Nor would CMS have violated any notice requirement if the Final Rule had omitted that rationale.  No principle of law prevents an agency from omitting reasoning from the Final Rule that was included in the Proposed Rule.

If applied to other cases, the district court's demand for stringent correspondence between the reasons stated in a proposed rule and in a final rule would impose an unprecedented constraint on agencies' ability to improve rules through notice and comment. "If an agency were required to issue a second notice and provide an opportunity for a second set of comments every time it decided to make a change in response to the first round of comments, the rulemaking process would be endless." 1 Hickman & Pierce, *supra*, § 5.3.1, at 687. The court's position here would require agencies to engage in repeated notice-and-comment cycles not only until the final *rule* is identical to the proposed rule, but also until the agency's final *explanation* is identical to that in the proposed rule. Neither the Medicare statute nor the APA requires or permits that result.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB

 s/ Weili J. Shaw
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

MARCH 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,463 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

s/ Weili J. Shaw
WEILI J. SHAW

**ADDENDUM**

**TABLE OF CONTENTS**

42 U.S.C. § 1395w-23....................................................................................A1

42 U.S.C. § 1395hh........................................................................................A2

**42 U.S.C. § 1395w-23**

**§ 1395w–23. Payments to Medicare+Choice organizations**

**(a) Payments to organizations**

  **(1) Monthly payments**

    **(A) In general**

      Under a contract under section 1395w–27 of this title and subject to subsections (e), (g), (i), and (l) and section 1395w–28(e)(4) of this title, the Secretary shall make monthly payments under this section in advance to each Medicare+Choice organization, with respect to coverage of an individual under this part in a Medicare+Choice payment area for a month, in an amount determined as follows:

. . . .

    **(C) Demographic adjustment, including adjustment for health status**

    **(i) In general**

      Subject to subparagraph (I), the Secretary shall adjust the payment amount under subparagraph (A)(i) and the amount specified under subparagraph (B)(i), (B)(ii), and (B)(iii) for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, including adjustment for health status under paragraph (3), so as to ensure actuarial equivalence. The Secretary may add to, modify, or substitute for such adjustment factors if such changes will improve the determination of actuarial equivalence.

    **(ii) Application of coding adjustment**

      For 2006 and each subsequent year:

        (I) In applying the adjustment under clause (i) for health status to payment amounts, the Secretary shall ensure that such adjustment reflects changes in treatment and coding practices in the fee-for-service sector and reflects differences in coding patterns between Medicare Advantage plans and providers under part[2] A and B to the extent that the Secretary has identified such differences.

        (II) In order to ensure payment accuracy, the Secretary shall annually conduct an analysis of the differences described in subclause

---

[2] So in original. Probably should be ''parts''.

A1

(I). The Secretary shall complete such analysis by a date necessary to ensure that the results of such analysis are incorporated on a timely basis into the risk scores for 2008 and subsequent years. In conducting such analysis, the Secretary shall use data submitted with respect to 2004 and subsequent years, as available and updated as appropriate.

(III) In calculating each year's adjustment, the adjustment factor shall be for 2014, not less than the adjustment factor applied for 2010, plus 1.5 percentage points; for each of years 2015 through 2018, not less than the adjustment factor applied for the previous year, plus 0.25 percentage point; and for 2019 and each subsequent year, not less than 5.9 percent.

(IV) Such adjustment shall be applied to risk scores until the Secretary implements risk adjustment using Medicare Advantage diagnostic, cost, and use data.

. . . .

**42 U.S.C. § 1395hh**

**§ 1395hh. Regulations**

**(a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation**

(1) The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term ''regulations'' means, unless the context otherwise requires, regulations prescribed by the Secretary.

. . . .

(4) If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.

**(b) Notice of proposed regulations; public comment**

(1) Except as provided in paragraph (2), before issuing in final form any regulation under subsection (a), the Secretary shall provide for notice of the

A2

A3

proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

    . . . .